# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BRUCE GALLANT, Individually and On Behalf of All Others Similarly Situated, | **CIVIL ACTION NO. 06-12875-WHP** |
| Plaintiff, | |
| vs. | CLASS ACTION COMPLAINT |
| CONNETICS CORPORATION, THOMAS G. WIGGANS, C. GREGORY VONTZ, and ALEXANDER J. YAROSHINSKY, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff, Bruce Gallant ("Plaintiff"), alleges the following based upon the investigation by Plaintiff's counsel, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Connetics Corporation ("Connetics" or the "Company") securities analysts' reports and advisories about the Company, and information readily available on the Internet, and Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

1. This is a federal class action on behalf of purchasers of the common stock of Connetics between June 28, 2004 and July 9, 2006, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2. Connetics is a specialty pharmaceutical company that develops and

1

commercializes products for the medical dermatology marketplace.

3.     The complaint alleges that, throughout the Class Period, defendants failed to disclose material adverse facts about the Company's financial well-being and its ability to bring Velac, Connetics' new acne drug, to the market. Specifically, defendants failed to disclose: (1) that the Company would be unable to obtain FDA approval for Velac due, in part, to high incidence of tumors in a carcinogenicity study; (2) that, as a result of the foregoing, defendants' statements concerning Velac's approvability and future financial expectations from its success were lacking in any reasonable basis when made; (3) that the Company improperly accounted for rebates; (4) specifically, that the Company, among other things, understated its rebate reserves; (5) that the Company lacked adequate internal controls; (6) that the Company's financial statements were presented in violation of Generally Accepted Accounting Principles ("GAAP"); (7) that, as a result of the foregoing, the Company would be unable to achieve its forecasted operating results; and (8) that, as a result of the above, the Company's financial statements were materially false and misleading at all relevant times.

4.     On April 26, 2005, Connetics stunned investors when the Company announced that the FDA had requested additional information concerning the Company's new drug to treat acne, Velac.

5.     On this news, shares of Connetics plummeted $5.27, or 19.1 percent, to close, on April 27, 2005, at $22.30 per share, on unusually heavy trading volume.

6.     On June 13, 2005, Connetics, before the market opened, further shocked investors when the Company announced that it had received a non-approvable letter from the FDA for Velac. On this news, shares of Connetics sank $5.64, or 27.2 percent, to close, on June 13, 2005, at $15.13 per share, on unusually heavy trading volume.

7.     On March 28, 2006, the SEC announced that it had filed suit in the United States District Court for the Southern District of New York against defendant Alexander J. Yaroshinsky ("Yaroshinsky"), charging him with illegally trading on the basis of non-public, inside information after learning the FDA's preliminary reactions to a study relating to cancer tests of Velac, Connetics' new drug for the treatment of acne.

8.     On May 3, 2006, Connetics, after the market closed, announced that the Company's financial statements for the year ended December 31, 2005, and potentially additional periods, should no longer be relied upon, as the Company had determined that it understated its rebate reserves as of the end of 2005.  The Company also stated that, for the second quarter of 2006, it projected total revenues of $50.5 million to $52.5 million, and total revenues between $211 million and $217 million for 2006.

9.     On June 22, 2006, the SEC filed an amended complaint against defendant Yaroshinsky, which included details of the study relating to cancer tests of Velac.  The SEC also named one of defendant Yaroshinsky's neighbors as a defendant, alleging that the individual had traded on inside information received from defendant Yaroshinsky.

10.     On July 10, 2006, before the market opened, Connetics announced that the Company expected revenue and earnings per share for the second quarter, and for the full year 2006, to be materially below the amounts included in the guidance that the Company provided on May 3, 2006.

11.     On this news, shares of Connetics plunged $3.93, or 33.6 percent, to close, on July 10, 2006, at $7.76 per share, on unusually heavy trading volume.

12.     As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of Connetics' common stock, Plaintiff and other class members have

suffered significant losses and damages.

## JURISDICTION AND VENUE

13.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

14.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

15.    Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this Judicial District.  In connection with the acts, conduct and other wrongs alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

16.    Plaintiff, Bruce Gallant, as set forth in the accompanying certification, incorporated by reference herein, purchased Connetics common stock at artificially inflated prices during the Class Period and has been damaged thereby.

17.    Defendant Connetics is a Delaware corporation with its principal place of business located at 3160 Porter Drive, Palo Alto, California 94304.

18.    Defendant Thomas G. Wiggans ("Wiggans") was, at all relevant times, the Company's Chief Executive Officer and a director.  Defendant Wiggans has also served as the

4

Company's Chairman since January 2006.

19.    Defendant C. Gregory Vontz ("Vontz") was, at all relevant times, the Company's Chief Operating Officer.  Defendant Vontz has also served as the Company's President since February 2005 and as a director since March 2005.

20.    Defendant Yaroshinsky was, at all relevant times, a Vice President of the Company.

21.    Defendants Wiggans, Vontz, and Yaroshinsky are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Connetics' quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market.  Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading.  The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## SUBSTANTIVE ALLEGATIONS
### Background

22.    Connetics is a specialty pharmaceutical company that develops and commercializes products for the medical dermatology marketplace.

5

**Materially False and Misleading**
**Statements Issued During the Class Period**

23.     The Class Period begins on June 28, 2004.  At that time, Connetics was informed

that, because fifty-five percent of mice treated with Velac in a six month carcinogenicity study

developed tumors, the chances of the drug receiving FDA approval were highly unlikely.

24.     On July 28, 2004, Connetics announced financial results for the second quarter of

2004, ended June 30, 2004.  The Company reported net income of $7.5 million or $0.19 per

diluted share, and stated that total revenues for the second quarter increased 92 percent to $38.3

million.  Commenting on these results, defendant Wiggans stated:

> This quarter's impressive results showcase our achievements in
> every aspect of our operations and speak to the potential for further
> growth and expansion of a valuable specialty pharmaceutical
> franchise.  We are confident in our ability to achieve continued
> revenue growth with our current brands and look forward to
> launching up to three new products from our pipeline within the
> next 12 months.   Based on our commercial activities with
> Soriatane and the new distribution agreement we have entered into
> we are raising our financial guidance for the balance of the year.
> Looking ahead, we are diligently preparing to initiate two clinical
> trials while preparing our commercial operations for the
> introduction of Actiza, Extina and Velac.

25.     On August 5, 2004, Connetics filed its quarterly report with the SEC on Form 10-

Q.  The Company's Form 10-Q was certified by defendant Wiggans and reaffirmed the

Company's previously announced financial results.   With respect to the presentation of its

financial results, the Company stated:   "We believe that we have included all adjustments,

consisting of normal recurring adjustments, considered necessary for a fair presentation. We

reclassify as necessary certain prior year balances to conform to the current year presentation."

The Company's Form 10-Q also contained the following Sarbanes-Oxley required certifications

signed by defendant Wiggans:

6

1.     I have reviewed this quarterly report on Form 10-Q of Connetics Corporation;

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.     The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

    a)     designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)     evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    c)     disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.     The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)     all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the

registrant's ability to record, process, summarize and report financial information; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

***

SECTION 906 CERTIFICATION

(1) the Report fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934, and

(2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company at the dates and for the periods indicated.

26.    On October 25, 2004, Connetics announced that the FDA had accepted for filing the Company's new drug application for Velac. Specifically, the Company stated:

Connetics Corporation, a specialty pharmaceutical company focused on dermatology, today announced that the U.S. Food and Drug Administration has accepted for filing the Company's New Drug Application for Velac, as of August 23, 2004, with a user fee goal date of June 25, 2005.

Velac is an investigational new drug that combines clindamycin 1% and tretinoin 0.025% in a gel formulation as a potential new topical treatment for acne. In March, Connetics announced positive results from its Phase III clinical trials with Velac versus clindamycin gel and tretinoin gel for the treatment of acne.

The topical prescription acne category is one of the largest segments in the U.S. dermatology market, and is estimated to exceed $1.2 billion annually. Approximately 17 million people in the U.S. have acne resulting in approximately 5.5 million office visits per year.

27.    Also on October 25, 2004, Connetics announced financial results for the third quarter of 2004, ended September 30, 2004. The Company reported net income for the third quarter ended September 30, 2004 of $3.7 million, or $0.10 per diluted share, which included a

$3.5 million milestone payment due to Yamanouchi Europe B.V. in conjunction with the submission of the Company's new drug application for Velac.  Total revenues for the third quarter of 2004 were $37.3 million, compared with total revenues of $19.7 million for the third quarter of 2003.  The Company also highlighted the FDA's acceptance of the new drug application for Velac as a significant activity in the third quarter.

28.     Commenting on these results, defendant Wiggans stated:

> I am delighted to report on our progress, particularly our recent regulatory milestones including the FDA approval of Evoclin and the filing of the NDA for our Velac product.  With the planned commercial launch of Evoclin in the fourth quarter, we continue to expand our commercial product portfolio and achieve our corporate goals and objectives.  During October, we expanded our team of sales representatives to 124 from 66.  Our new sales representatives are currently undergoing comprehensive training, and we look forward to their contribution beginning later this quarter.  The Company continues to execute well on all fronts, and we are anticipating a strong finish to 2004.

29.     Connetics also held a conference call on October 25, 2004 to discuss the third quarter financial results.  During the call, defendant Vontz stated:

> Also, an important accomplishment in the third quarter for our regulatory team, who completed our largest [new drug application] filing to date with the Velac filing, a tremendous amount of work by our team, very excited that we achieved our goal, and now can await a PDUFA date of June 25th, 2005.

30.     Also, during the October 25, 2004 conference call,  the following exchange occurred:

> ANALYST:   I'd like to maybe shed a little more color, if I could, on the clindamycin product, formerly Actiza, I guess now Evoclin, and also Velac, regarding label.  Will you be able to get – maybe you can't discuss this for competitive reasons, but versus Clindagel, for example, will you have any label advantages over that product, perhaps irritation tolerance?
>
> And also on the subject of Velac as well, I noticed that Duac really has only a general – excuse me, an inflammatory acne claim, and

yet it does I think in excess of $40 million. You will be able to get a general acne claim on that? Is that what we should expect?

\*\*\*

VONTZ: Mark, you're spot on, though, with your assessment. With Evoclin, it is a 505B (2) reference label, so there is no comparative information in the label. Where we will have comparative information, and advantages, though, frankly, is with Velac. The world is changing, as you're probably well aware, with endpoints. The new hurdle that has been imposed in the last 18 months is – for a full acne claim is demonstration of both inflammatory and non-inflammatory resolution of lesions, and that we have in spaces with Velac.

31.    On November 8, 2004, Connetics filed its quarterly report with the SEC on Form 10-Q. The Company's Form 10-Q reaffirmed the Company's previously announced results and contained Sarbanes-Oxley required certifications signed by defendant Wiggans substantially similar to the certifications contained in ¶ 26, *supra*. With respect to the presentation of its financial results, the Company also stated: "We believe that we have included all adjustments, consisting of normal recurring adjustments, considered necessary for a fair presentation."

32.    On November 22, 2004, Connetics affirmed the Company's patent position with respect to Velac. Specifically, the Company stated:

Connetics Corporation, a specialty pharmaceutical company focused on dermatology, today announced that Medicis Pharmaceutical Corporation informed Connetics it has in-licensed rights to U.S. Patent No. 5,721,275 dated February 24, 1998 that it asserts will be infringed by Connetics' product candidate Velac. Connetics, having previously reviewed the patent in 2003, is confident that Velac will not infringe the patent assuming the patent is valid. Connetics has not taken any legal action and is not aware of any legal filings related to this matter by the patent holder or Medicis.

The U.S. Food and Drug Administration has accepted for filing Connetics' New Drug Application for Velac as of August 23, 2004, with a user fee goal date of June 25, 2005. Connetics licensed from Yamanouchi Europe B.V. the rights to U.S. Patent No. 5,690,923 dated November 25, 1997, to develop and

10

commercialize Velac exclusively in the U.S. and Canada, and non-exclusively in Mexico. Velac is currently approved in France.

33.     On November 23, 2004, Connetics announced that the Company had received a non-approvable letter from the FDA for Extina but also provided some reassurance to the market regarding Velac.  Specifically, the Company stated:

> Connetics Corporation, a specialty pharmaceutical company focused on dermatology, today announced that the U.S. Food and Drug Administration (FDA) has issued a non-approvable letter (dated November 23, 2004) for Extina, an investigational new drug formulation of 2% ketoconazole for the treatment of seborrheic dermatitis. The FDA concluded that Extina was not effective for the treatment of seborrheic dermatitis because it was not superior to placebo foam.

> Connetics announced in April 2003 that results from its Phase III clinical trial with Extina demonstrated non-inferiority to Nizoral (ketoconazole) 2% Cream as measured by the endpoint of the Investigator's Static Global Assessment. Connetics also announced the results did not achieve statistical superiority versus placebo foam.

> "The FDA's decision is disappointing and surprising. Based on discussions with the FDA regarding the requirements for the Phase III trial, we believe Extina met the study endpoints and that the NDA was approvable," said Thomas G. Wiggans, Connetics' Chief Executive Officer. "We believe that Extina demonstrated efficacy and warranted approval. However, under the circumstances, we will evaluate all options for Extina."

> Commenting on the company's near-term commercial prospects, Mr. Wiggans added, "With our recently expanded and highly experienced sales force, we project continued growth from our core brands in 2005, and we are prepared for the commercial launch of Evoclin, our new acne foam product, early next month. In addition, we have submitted an NDA for Velac and have a robust pipeline of clinical and formulation-stage product candidates. We believe that any potential lost revenue for Extina in 2005 will be offset by expense savings as we will not be incurring the planned commercialization costs for Extina."

> As a result of today's announcement, Connetics now expects product revenues and earnings per diluted share for the 2004 fourth

11

quarter will come in at the low end of previous guidance ranges of
$43 million to $46 million and $0.16 to $0.18, respectively.

34.     On January 25, 2005, Connetics announced financial results for the fourth quarter

and year ended December 31, 2004.  The Company reported record net income for the fourth

quarter of 2004 of $6.4 million, or $0.17 per diluted share, and total revenues of $43.8 million.

For the year, the Company reported net income of $19.4 million, or $0.52 per diluted share,

which included a third quarter $3.5 million milestone payment to Yamanouchi associated with

the filing of the Velac new drug application.

35.     Commenting on these results, defendant Wiggans stated:

> Strong product revenue growth during 2004 contributed to our first
> full year of profitability and the fifth consecutive year of growth in
> our core brands OLUX and Luxiq.  Our first product in the acne
> market, Evoclin, was approved and launched during the fourth
> quarter. While early in the launch phase, the prescription data has
> been strong and the feedback from physicians has been
> encouraging, which we believe bodes well for a dynamic and
> expanding presence for Connetics in the acne market. We also
> marked the success of 2004 with the acquisition of Soriatane.
> Through our promotional efforts Soriatane was a significant
> financial contributor in 2004 and also was an important product for
> patients. With four marketed brands, a substantially expanded
> commercial team and a robust product pipeline, we believe
> Connetics is poised for another exciting and highly productive
> year.

36.     With respect to its financial guidance for 2005, Connetics stated:

> Connetics expects 2005 total revenues to be between $190 million
> and $200 million, representing an increase of 32% to 39%
> compared with 2004. Combined SG&A and R&D expenses are
> projected to be between $116 million and $123 million. Diluted
> EPS for 2005 is projected to grow by approximately 70% and to be
> in the range of $0.88 to $0.92, based on an estimated 42.3 million
> shares outstanding and an estimated effective tax rate of 10%.
> Assuming FDA approval of Velac during 2005, the Company
> anticipates making a milestone payment of $5 million to
> Yamanouchi. This payment will be capitalized and amortized over
> the life of the patent, which expires in 2014.

The Company expects first quarter 2005 total revenues to be between $42 million and $44 million. Consistent with prior years of heavier expenditures in the first quarter compared with the immediately preceding quarter, Connetics projects combined SG&A and R&D expenses for the first quarter to range from $33.5 million to $35.5 million, reflecting a significant presence at dermatology conferences during the quarter, an increase in product promotion costs, particularly the Evoclin launch, and higher costs associated with a significantly expanded salesforce. Connetics projects net income per share for the first quarter of 2005 of $0.01 or $0.02.

37.    Also on January 25, 2005, Connetics held a conference call to discuss the Company's financial results. During the call, defendants stated the following:

[WIGGANS]:          Secondly, while it is obviously still early for Evoclin, the initial impact of our sales and marketing efforts are very encouraging, and in fact, exceeding our expectations, which we believe bodes well for our entry in to the acne market.  We recognize this market is very competitive.  We know we need to devote considerable resources, as well as expertise and bring competitive products to this market.  But as we prepare not only to expand the launch of Evoclin, but prepare for a Velac launch, our plan encases (ph) that there will be a competitive product for Velac.  But we have excellent data on Velac.  We have now an expanded and very talented sales force.  And we are confident that we will be successful in this market with our acne franchise, and in particular, with Velac.

                                          ***

[HIGGINS- Connetics' CFO]:          Soriatane, we're forecasting approximately 20 percent year-over-year growth, making up approximately one-third of our revenue.  And our acne products- Evoclin, which we just launched, and Velac, we expect to be launched midyear, making up the balance or roughly 20 percent of our sales.  That amount for our acne franchise in 2005 we expect to be split roughly 50-50 between both Evoclin and Velac.

                                          ***

In 2006, we see revenue driven by continued growth of Evoclin. We forecast enjoying a full year of Velac sales- in addition, potential new product launches at the end of 2006.  And this is matched with expenses that we believe will begin- the increases to flatten year over year.  The last couple of years, we've seen

13

tremendous investment in our commercial organization. We believe we're getting leverage off that.

\*\*\*

[VONTZ]: On the Velac front, as Tom mentioned, preparations are completely underway for getting ready to launch this product. And as part of our launch strategy, we have worked out kind of a pulsed release of clinical data. We're very excited at the upcoming AAD meeting in New Orleans that of the 11 abstracts that we have submitted and have been accepted, 5 of those are unique to Velac. And those abstracts highlight some brand new data that will play a critical role in supporting the label for this product. So stay tuned when that data comes out- very, very exciting news for this product.

We additional [sic] have another tranche of data for Velac scheduled to be out at the summer AAD time to coincide with the launch of the product. So a lot attention and energies by our marketing team and sales operations group being focused on preparations for Velac.

38. On March 11, 2005, analysts at Piper Jaffray upgraded their rating on Connetics stock based upon their belief that Velac had strong potential in its market and would receive FDA approval.

39. On March 16, 2005, Connetics filed its annual report with the SEC on Form 10-K. The Company's Form 10-K was signed by defendant Wiggans and reaffirmed the Company's previously announced financial results. The Company's Form 10-K also contained the following Sarbanes-Oxley required certifications signed by defendant Wiggans:

1. I have reviewed this annual report on Form 10-K of Connetics Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in

14

all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the

registrant's ability to record, process, summarize and report financial information; and

        b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

***

SECTION 906 CERTIFICATION

(1)     The Report fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934, and

(2)     The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Registrant.

40.     On April 13, 2005, defendant Yaroshinsky received a call from the FDA, in which the FDA informed Yaroshinsky and Connetics that the FDA's Executive Carcinogenicity Assessment Committee ("ECAC"), the FDA's primary consulting body on carcinogenicity issues, had concluded that the Velac Gel vehicle may be a "tumor promoter or a carcinogen." Additionally, the FDA staff informed Connetics that "this is a serious issue for a topical product for the treatment of acne."

41.     On April 14, 2005, Connetics held its 2005 Annual Analyst and Investor Day in New York City. During the Investor Day, management stated the following:

        -     Outlining the Company's Long-Term Goals:    Connetics' Chief Executive Officer, Thomas G. Wiggans, outlined the Company's long-term growth goals and put them in the context of a rapidly growing medical dermatology market. "Connetics is building the premier U.S. medical dermatology company through best-in-class technology and product innovation, strong commercial capabilities, outstanding customer service and excellent execution," said Wiggans. "This market will grow from $3.6 billion in 2000 to a projected $6 billion by 2010. We have aggressive plans to capture an increasing share of this market, and we have set a goal to achieve annual product revenues of $750 million by the end of the decade. This includes more than $500

16

million in annual revenues from products that we currently market or are already in our development pipeline."

-       Revising 2005 Revenue Guidance Upward: Connetics is now projecting 2005 total revenue will be between $195 million and $206 million, up from prior guidance of $190 million to $200 million, which represents an increase of 35% to 42% compared with 2004 total revenue.  Guidance for combined SG&A and R&D expense increased to $121 million to $148 million from $116 million to $123 million.  Diluted EPS for 2005 is projected to remain unchanged from previous guidance, and be in the range of $0.88 to $0.92.

42.     On April 26, 2005, Connetics announced financial results for the first quarter of 2005.  The Company reported net income of $1.0 million, or $0.03 per diluted share and revenues of $42.4 million.  Commenting on these results, defendant Wiggans stated:

I am very pleased to report on a busy first quarter that included sales from our newly launched Evoclin product and the successful completion of a $200 million convertible financing.  We expect further revenue gains from our expanded sales force and new contract sales agreement with Ventiv for three of our products. Additionally, we have a number of near-term regulatory and clinical milestones as outlined during our Analyst and Investor Day event held April 14, 2005.

43.     The statements contained in ¶¶ 24-43 were materially false and misleading when made because defendants failed to disclose or indicate the following: (1) that the Company would be unable to obtain FDA approval for Velac due, in part, to high incidence of tumors in a carcinogenicity study; (2) that, as a result of the foregoing, defendants' statements concerning Velac's approvability and future financial expectations from its success were lacking in any reasonable basis when made; (3) that the Company improperly accounted for rebates; (4) specifically, that the Company, among other things, understated its rebate reserves; (5) that the Company lacked adequate internal controls; (6) that the Company's financial statements were presented in violation of GAAP; (7) that, as a result of the foregoing, the Company would be unable to achieve its forecasted operating results; and (8) that, as a result of the above, the

Company's financial statements were materially false and misleading at all relevant times.

### The Truth Begins to Emerge

44.     Also on April 26, 2005, Connetics stunned investors when the Company

announced in its first quarter earnings conference call that the FDA had requested additional

information concerning the Company's new drug, Velac. Specifically, during the call, defendant

Wiggans stated:

> Regarding Velac, we are – we continue to be in active discussions
> with the FDA on their review of our NDA. As we've moved
> through the review process, we've been pleased with the review.
> And up to this point, we've been in active communication with the
> agency and have continued to be in active communication with the
> agency over the last several weeks, answering their questions as
> they finalize their review of the various sections.
>
> As part of this review, we recently received communications that
> indicated FDA were interpreting results of one of our pre-clinical
> studies in a different fashion than we did in our submission. I
> realize over the past several weeks there's been speculation
> regarding the approvability of a new retinoid, or the approvability
> of a combo product. The question that they have asked is
> unrelated to either one of these subjects.
>
> We conducted one of our pre-clinical studies in a transgenic mouse
> model. And in that study, there was a positive response to our
> product. At the time, we carefully analyzed the results with a
> panel of leading experts in this model and leading toxicologists.
> The outcome of that was that the experts advised us that this mouse
> model is known to have limitations and they concluded that the
> positive response was a result of one of these limitations of the
> model.
>
> Their advise is supported, in fact, by other products which have
> had a positive finding in this model, resulting in a clinical hold,
> only to be released later, based upon submission of additional data.
> And in fact, benzoyl peroxide, a commonly used OTC acne
> product, an ingredient in several prescription acne products, has Rx
> labeling that notes a positive result in this model. But, because up
> to this point FDA had not raised this issue with us, we were
> surprised to receive this information; however, we are in
> discussions with them on their question and we expect to submit

18

additional information well before the PADUFA date, which further supports our original conclusion included in the NDA.

I would point out that, as a rule, we do not feel it is appropriate, frankly, to provide regular updates on our discussions with the FDA, and we do not intend to provide further updates on this until we have more definitive information. Because, obviously, this is limited information for you as well as for us. However, we felt it was important to take the opportunity to give you an update on this recent information.

While I realize that this question might raise more questions, rather than answers for you, just as it did us, I can tell you that we are very committed to working with the FDA to get them the information so this issue can be resolved and enable us to launch Velac on schedule.

45.     On this news, shares of Connetics plummeted $5.27, or 19.1 percent, to close, on April 27, 2005, at $22.30 per share, on unusually heavy trading volume.

46.     However, shares of Connetics' stock continued to trade at artificially inflated levels as defendants masked the gravity of the issue. Specifically, the SEC alleged that the Company's statement "stopped short of disclosing the full extent of the FDA's concerns and the incidence of tumors in the mice tested. Most notably, missing from the release was the ECAC's conclusion that the 'vehicle was positive in this assay and may be a tumor promoter or a carcinogen.'"

47.     On May 10, 2005, Connetics filed its quarterly report with the SEC on Form 10-Q. The Company's Form 10-Q reaffirmed the Company's previously announced results and contained Sarbanes-Oxley required certifications signed by defendant Wiggans substantially similar to the certifications contained in ¶ 26, *supra*. With respect to the presentation of its financial results, the Company also stated: "We believe that we have included all adjustments, consisting of normal recurring adjustments, considered necessary for a fair presentation."

48.     On June 13, 2005, before the market opened, Connetics further shocked investors

19

when the Company announced that it had received a non-approvable letter from the FDA for

Velac. Specifically, the Company stated:

> Connetics Corporation, a specialty pharmaceutical company focused on dermatology, announced today that the U.S. Food and Drug Administration (FDA) has issued a non-approvable letter dated June 10, 2005 for Velac (a combination of 1% clindamycin and 0.025% tretinoin) Gel, an investigational new drug formulation for treating acne. The only issue raised in the non-approvable letter was a positive carcinogenicity signal that was detected in a TgAC mouse dermal carcinogenicity study.
>
> "We are disappointed in the FDA's decision. As discussed during our first quarter earnings call on April 26, we were particularly disappointed that FDA did not notify us of this as a potential issue until two months prior to the PDUFA date," said Thomas G. Wiggans, chief executive officer of Connetics. "We remain committed to bringing Velac to market, and will be working with FDA representatives to determine what is required to do so. Despite this setback, Connetics will continue to expand its leading position in the dermatology field with four brands on the market and a robust and diverse pipeline."
>
> As a result of today's announcement, Connetics now projects 2005 total revenues to be $182 million to $188 million, down from previous guidance of $195 million to $206 million. Combined SG&A and R&D expenses for 2005 are projected to be between $121.5 million and $125.0 million. Diluted EPS for 2005 is projected to be in the range of $0.66 to $0.70, versus previous guidance of $0.88 to $0.92. The revised revenue and earnings guidance represents growth of approximately 20% over 2004 revenues and 33% over 2004 earnings.

49.    On this news, shares of Connetics sank $5.64, or 27.2 percent, to close, on June

13, 2005, at $15.13 per share, on unusually heavy trading volume.

50.    On August 2, 2005, Connetics announced financial results for the second quarter

of 2005. In a press release entitled "Connetics Second Quarter Revenues Increase 19 Percent;

OLUX, Soriatane and Evoclin Achieve All-Time Quarterly Prescription Highs; Company

Increases Full-Year Revenue Guidance," the Company stated, in relevant part:

Connetics Corporation, a specialty pharmaceutical company that develops and commercializes dermatology products, announced today total revenues for the second quarter of 2005 were $45.4 million, an increase of 19% compared with 2004 second quarter total revenues of $38.3 million.  During the second quarter of 2005 prescriptions written for OLUX, Soriatane and Evoclin reached all-time quarterly highs.

Second quarter sales of Soriatane were $18.3 million.  Evoclin, launched in the fourth quarter of 2004, continued its strong introduction with sales of $7.0 million during the quarter, of which nearly $1 million represented sales to a U.S.-based distributor that exports branded pharmaceutical products to select international markets.  This distributor relationship has been in place for Soriatane, OLUX and Luxiq since 2004.  Sales of OLUX during the quarter totaled $14.0 million.  The product continues to enjoy strong prescription growth; however, net sales for the second quarter reflect a charge for unusually high wholesaler returns of approximately $2.3 million.  The product returns are related to expired and estimated expiring product inventory at wholesalers, arising from past distribution practices by the wholesalers that are not expected to repeat under recently entered distribution service agreements.  With these agreements in place, Connetics believes it has taken an appropriate one-time provision to address the OLUX returns.  Sales of Luxiq during the quarter totaled $5.8 million.

Selling, general and administrative expenses for the second quarter of 2005 increased to $25.1 million from $17.2 million in the same period last year, reflecting expenses related to a near doubling of the Company's sales force, marketing and promotional activities related to the launch of Evoclin, and expenses related to the anticipated launch of Velac.  Research and development expenses for the second quarter of 2005 were $8.8 million, compared with $5.0 million last year, reflecting increased clinical activities including ongoing Phase III trials for Desilux VersaFoam-EF and Primolux VersaFoam-EF.

Net income for the second quarter of 2005 was $2.5 million, or $0.07 per diluted share.  This compares with net income of $7.5 million, or $0.19 per diluted share, for the second quarter of 2004, and primarily reflects anticipated higher costs in 2005 associated with planned sales, marketing and product development programs.

51.  Commenting on these results, defendant Wiggans stated:

This quarter marked another solid performance by Connetics, with strong prescription growth across all of our products.  We are very

pleased with the continued adoption of Evoclin as well as the refill prescriptions we are beginning to see. For the second half of the year, we anticipate an increased contribution from our co-promotion partnership with Ventiv, and will continue to focus on pipeline projects including the commencement of the Extina Phase III program in the third quarter of 2005. We are disappointed with the non-approvable letter we received for Velac in June. Addressing the FDA issues remains our highest priority as we work with the agency to determine requirements to obtain product approval for Velac.

52.     On August 8, 2005, Connetics filed its quarterly report with the SEC on Form 10-Q. The Company's Form 10-Q reaffirmed the Company's previously announced results and contained Sarbanes-Oxley required certifications signed by defendant Wiggans substantially similar to the certifications contained in ¶ 26, *supra*. With respect to the presentation of its financial results, the Company also stated: "We believe that we have included all adjustments, consisting of normal recurring adjustments, considered necessary for a fair presentation."

53.     On November 1, 2005, Connetics announced financial results for the third quarter of 2005. In a press release entitled "Connetics Reports Third Quarter Revenues of $55.3 Million and Diluted EPS of $0.39," the Company stated, in relevant part:

Connetics Corporation, a specialty pharmaceutical company that develops and commercializes dermatology products, announced today that its net income for the third quarter ended September 30, 2005 was $15.4 million, up from net income of $3.7 million for the third quarter of 2004. Diluted earnings per share increased to $0.39 from $0.10 for the comparable period in 2004. The company's financial results for the 2005 third quarter include a $7.0 million revenue benefit due to a reserve adjustment, as described below.

Total revenues for the third quarter of 2005 were $55.3 million, an increase of 48% over total revenues of $37.3 million in the third quarter of 2004. Total product revenues for the quarter increased 49% to $55.3 million, up from $37.0 million in the third quarter of 2004, reflecting contribution from sales of Evoclin, which was launched in December 2004, and continued growth in sales of Soriatane, OLUX and Luxiq. Third quarter product sales included:

22

Soriatane $23.1 million, Evoclin $7.7 million, OLUX $17.3 million and Luxiq $7.0 million.

Product revenues for the quarter include a one-time $7.0 million benefit from the reduction of revenue reserve estimates related to Soriatane.  The original estimates, based on information available to the Company at the time it acquired the product rights from Roche in March 2004, were revised after Roche furnished actual product return and Medicaid information during the 2005 third quarter.  Excluding the $7.0 million benefit, product revenues for the quarter were up 30% over the third quarter of 2004.

Selling, general and administrative expenses for the third quarter of 2005 increased to $23.4 million, from $16.8 million in the comparable period last year, primarily due to costs associated with a larger sales force and promotional activities related to Evoclin.  Research and development expenses for the third quarter of 2005 were $8.2 million, compared with $6.0 million in the third quarter of 2004, reflecting the Company's late-stage clinical activities, including Phase III trials with Primolux and Extina.

Connetics' cash and investments, including restricted cash, as of September 30, 2005, totaled $273 million.

54.     Commenting on these results, defendant Wiggans stated:

The third quarter marked another solid period of commercial growth while we continued to make progress advancing our product pipeline.  Evoclin continues to be the most successful product launch in our Company's history, and now is the leading branded clindamycin product in dermatology.  In addition, the remainder of our product portfolio continues to enjoy revenue growth.  We are investing significantly in our pipeline to drive our future growth, and we have several global licenses that we expect will begin generating new royalty and contract revenues for the Company in the coming year.  In the final months of 2005, we continue to build a broad platform that will allow Connetics to become the leading medical dermatology company in the U.S.

55.     On November 9, 2005, Connetics filed its quarterly report with the SEC on Form 10-Q.  The Company's Form 10-Q reaffirmed the Company's previously announced results and contained Sarbanes-Oxley required certifications signed by defendant Wiggans substantially similar to the certifications contained in ¶ 26, *supra*.  With respect to the presentation of its

financial results, the Company also stated: "We believe that we have included all adjustments,

consisting of normal recurring adjustments, considered necessary for a fair presentation."

56.     On January 31, 2006, Connetics announced financial results for the fourth quarter

of 2005.   In a press release entitled "Connetics Reports Fourth Quarter Revenues of $41.3

Million and EPS of $0.40," the Company stated, in relevant part:

> Connetics Corporation, a specialty pharmaceutical company that
> develops and commercializes dermatology products, today
> reported net income for the quarter ended December 31, 2005 of
> $15.1 million, or $0.40 earnings per share on a diluted "If-
> Converted" basis.
>
> ***
>
> Total revenues for the fourth quarter of 2005 were $41.3 million,
> compared with total revenues of $43.8 million in the fourth quarter
> of 2004.
>
> ***
>
> Significant activities in the fourth quarter of 2005 and subsequent
> weeks include the following:
>
> ***
>
> -       Connetics secured remaining worldwide rights to Velac, by
> way of an amendment to the license agreement with Astellas
> Pharma Europe B.V. (formerly Yamanouchi Euripe B.V.).   The
> original license in 2002 was limited to the United States, Canada
> and Mexico.   The financial results for the 2005 fourth quarter
> include the $1.0 million payment associated with this amendment.

57.     Commenting on these results, defendant Wiggans stated:

> Evoclin reached record market share levels during the quarter, and
> our other brands remain solid performers in increasingly
> competitive markets and against new entrants.   We are delighted
> that two of our partners, Pfizer and Novartis, recently received
> approvals to market products that incorporate Connetics' patented
> topical deliver technologies.   With the breadth of our commercial
> portfolio, the expected introduction of Desilux in the fourth quarter
> of this year, and our expanded sales presence, we believe
> Connetics is positioned for continued growth in 2006.

58. On March 13, 2006, Connetics filed its annual report with the SEC on Form 10-K. The Company's Form 10-K was signed by defendant Wiggans and reaffirmed the Company's previously announced financial results. The Company's Form 10-K also contained Sarbanes-Oxley required certifications signed by defendant Wiggans substantially similar to the certifications contained in ¶ 40, *supra*.

59. On March 28, 2006, the SEC announced that it had filed suit in the United States District Court for the Southern District of New York against defendant Yaroshinsky, charging him with illegally trading on the basis of non-public, inside information after learning the FDA's preliminary reactions to a study relating to cancer tests of Velac, Connetics' new drug for the treatment of acne. Specifically, the SEC stated:

> On March 28, the Securities and Exchange Commission filed suit in the United States District Court for the Southern District of New York against Alexander J. Yaroshinsky, a Vice President at Palo Alto, California-based Connetics Corp., charging him with illegally trading on the basis of non-public, inside information after learning the FDA's preliminary reactions to a study relating to cancer tests of its acne drug. At the Commission's request, the Honorable Michael B. Mukasey issued an order freezing Yaroshinsky's assets, temporarily restraining him from further violations, and granting other emergency relief.

> The Commission's complaint alleges that Yaroshinsky, who participated in tests which led the FDA to ultimately conclude that the drug was "unsafe for use," learned the FDA's preliminary views with respect to the cancer tests in an April 13, 2005 call with the FDA. Shortly thereafter, Yaroshinsky positioned himself to profit from a fall in the price of Connetics' stock. In accounts he controlled, Yaroshinsky sold 15,100 previously acquired Connetics shares, and bought 2,076 put contracts which gave him the right to sell Connetics shares at a fixed price and profit when the shares fell below that price. Ultimately, on June 13, 2005, when news of the non-approval was made public, Connetics' share price fell 27% and Yaroshinsky reaped a benefit of at least $680,000.

> The complaint charges Yaroshinsky with violations of the anti-fraud provisions of the Securities Exchange Act of 1934, specifically Section 10(b) and rule 10-b5 thereunder, and seeks a

> permanent injunction, disgorgement of all ill-gotten gains plus
> prejudgment interest, and civil money penalties.
>
> The Commission would like to acknowledge the assistance of
> Chicago Board Options Exchange.

60.    The statements contained in ¶¶ 45, 47-49, and 51-59 were materially false and misleading when made because defendants failed to disclose or indicate the following: (1) that the Company would be unable to obtain FDA approval for Velac due, in part, to high incidence of tumors in a carcinogenicity study; (2) that, as a result of the foregoing, defendants' statements concerning Velac's approvability and future financial expectations from its success were lacking in any reasonable basis when made; (3) that the Company improperly accounted for rebates; (4) specifically, that the Company, among other things, understated its rebate reserves; (5) that the Company lacked adequate internal controls; (6) that the Company's financial statements were presented in violation of GAAP; (7) that, as a result of the foregoing, the Company would be unable to achieve its forecasted operating results; and (8) that, as a result of the above, the Company's financial statements were materially false and misleading at all relevant times.

### The Truth Continues to Emerge

61.    On May 3, 2006, after the market closed, Connetics announced that the Company's financial statements for the year ended December 31, 2005, and potentially additional periods, should no longer be relied upon, as the Company had determined that its rebate reserves as of the end of 2005 were understated.  Specifically, in a press release entitled "Results of Operations and Financial Condition," the Company stated, in relevant part:

> Item 4.02 Non-Reliance on Previously Issued Financial Statements
> or a Related Audit Report or Completed Interim Review.  On May
> 3, 2006, the Company concluded that its financial statements for
> the year ended December 31, 2005, and potentially additional
> periods, should no longer be relied upon.  The Company has
> determined that its rebate reserves as of the end of 2005 were
> understated.    Rebates    are    contractual    discounts    offered    to

26

government programs and private health plans which are eligible for rebates at the time prescriptions are dispensed, subject to various conditions. The Company records quarterly reserve provisions for rebates by estimating rebate liability for product sold, based on factors such as timing and terms of plans under contract, time to process rebates, product pricing, sales volumes, units held by distributors, and prescription trends. Upon review, the Company has concluded that the rebate rates and method used to calculate the rebate liability did not fully capture the impact of these factors in its historical provision. Accordingly, the Company plans to restate its financial statements for the year ended December 31, 2005, and potentially additional periods.

The Company intends to file an amended Form 10-K for the year ended December 31, 2005 and any other required amendments to its annual and periodic reports, which will include the restated financial statements as soon as practicable after the Company completes its internal review and restatement of its financial statements and the external audit process is completed. The Company does not expect that it will be able to complete this process and make these filings before May 10, 2006, the deadline for timely filing the Form 10-Q for the quarter ended March 31, 2006.

The increase in the historical provision for rebate reserves will have the effect of decreasing revenues and earnings, accrued liabilities and retained earnings figures contained in our historical financial statements. We do not believe that this restatement will have an impact on the Company's historical cash position or operating expenses.

The Company and the audit committee of its board of directors have discussed the matters disclosed in this Current Report on Form 8-K with Ernst & Young LLP, the Company's independent registered public accounting firm.

62. On May 22, 2006, Connetics filed a Form 8-K with the SEC which announced that the Company had received a Notice of Delisting due to its failure to timely file its quarterly report with the SEC. Specifically, the Company stated:

On May 16, 2006, Connetics Corporation ("Connetics" or the "Company") received a Nasdaq Staff Determination notice from the Nasdaq Stock Market Listing Qualifications Department that the Company's failure to timely file its Quarterly Report on Form 10-Q for the period ended March 31, 2006 ("Form 10-Q") violated

27

Nasdaq Marketplace Rule 4310(c)(14). As a result, Connetics' common stock is subject to delisting from the Nasdaq National Market at the opening of business on May 25, 2006 unless we request a hearing in accordance with Nasdaq Marketplace Rules. We intend to request a hearing before a Nasdaq Listing Qualifications Panel to review the Staff Determination, which will automatically defer the delisting of our common stock pending the Panel's review and determination. Connetics' common stock will continue to be traded on The Nasdaq National Market after the hearing request is made and until the Panel issues a determination and any exception granted by the Panel has expired.

We have delayed filing our Form 10-Q until we complete the previously-announced restatement of our financial statements for the year ended December 31, 2005, and potentially additional periods. That restatement will affect the financial statements to be included in our Form 10-Q. We intend to file the Form 10-Q as soon as practicable after we complete our internal review and restatement of the financial statements and the external audit process is completed.

63.     On June 22, 2006, the SEC filed an amended complaint against defendant Yaroshinsky, which included details of the Velac 2004 mice study. The SEC also named one of defendant Yaroshinsky's neighbors as a defendant, alleging that the individual had traded on inside information received from defendant Yaroshinsky. Specifically, on June 23, 2006, the SEC stated:

The Securities and Exchange Commission announced the filing yesterday of an Amended Complaint in SEC v. Yaroshinsky, a case pending in the United States District Court for the Southern District of New York. The Amended Complaint adds Victor E. Zak as a defendant in the Commission's previously filed insider trading case against California drug executive Alexander J. Yaroshinsky. The Amended Complaint alleges that Zak, a resident of Newton, Massachusetts, received material non-public information from Yaroshinsky concerning the FDA staff's preliminary analysis of the carcinogenicity tests of Velac Gel, an acne drug being developed by Yaroshinsky's then employer, California-based Connetics Corporation. The Amended Complaint alleges that both Zak and Yaroshinsky traded on the basis of this information. In the end, Zak profited from his illegal trading by more than $900,000 and together, Yaroshinsky and Zak benefited financially by more than $1.58 million.

The Amended Complaint alleges that on April 13, 2005, at 2:15
p.m. Yaroshinsky and other representatives of Connetics
participated on a telephone call with FDA staff, during which the
FDA staff told Connetics that the FDA's Executive
Carcinogenicity Assessment Committee had concluded that the
Velac Gel vehicle may be a "tumor promoter or a carcinogen" and
that "this is a serious issue for a topical product for the treatment of
acne… ." Shortly after the call, Yaroshinsky called Zak, his friend
and former neighbor, and told him what he had learned earlier that
day from the FDA staff. Minutes later, Zak, who, prior to April 13
had maintained a 5,000 share long position in Connetics, began
executing transactions that positioned him to benefit from a drop in
Connetics' share price.

The Amended Complaint further alleges that between April 13 and
June 10, Yaroshinsky and Zak executed numerous trades.
Yaroshinsky purchased put contracts in his own account and in a
nominee account opened in the name of his mother-in-law and sold
shares of Connetics common stock in his own account. Zak
purchased put contracts, sold short Connetics shares, and sold his
long position of Connetics shares. All of the trading by defendants
was conducted in advance of a June 13, 2005 public announcement
by Connetics stating that it had received a "not approvable" letter
from the Food and Drug Administration ("FDA") concerning
Velac Gel. After the announcement, Connetics' stock price fell
27%. Specifically, the Amended Complaint alleges that
Yaroshinsky and Zak violated Section 10(b) and Rule 10b-5 of the
Securities Exchange Act of 1934. Among other relief, the
Amended Complaint seeks a permanent injunction, disgorgement
of all illegal profits, prejudgment interest and the imposition of
civil monetary penalties.

The Commission expresses its appreciation to the Chicago Board
Options Exchange for its assistance in the investigation of this
matter.

64.    On July 10, 2006, before the market opened, Connetics announced that the

Company expected revenue and earnings per share for the second quarter, and for the full year

2006, to be materially below the amounts included in the guidance that the Company provided

on May 3, 2006.  Specifically, the Company stated:

Connetics Corporation, a specialty pharmaceutical company that
develops and commercializes dermatology products, today
announced it expects revenues and earnings per share for the

second quarter, and for the full year 2006, to be materially below
the amounts included in the guidance that the Company provided
on May 3, 2006. The shortfall in second quarter revenue is due, in
part, to the Company's decision to reduce wholesaler inventory by
shipping product volumes that were below estimated prescription
demand, and due to lower product orders from an international
distributor. By shipping less than demand, overall wholesaler
inventory levels for the Company's products have been reduced by
approximately $7 million, a greater amount than originally
planned. The Company estimates that wholesalers had on average
approximately three and one-half months of inventory on hand as
of June 30, 2006. The Company intends to continue to ship below
estimated prescription demand during the remainder of 2006, with
a goal of further reducing average wholesaler inventory levels to
approximately two months on hand by the end of 2006.

As announced on May 3, 2006, Connetics has delayed filing its
Form 10-Q for the first quarter of 2006 until completion of a
restatement of financial statements for the year ended December
31, 2005, and potentially additional periods, which will affect the
financial statements to be included in its Quarterly Report on Form
10-Q. As previously announced, Connetics has determined that its
rebate reserves as of the end of 2005 were understated, and that the
rebate accruals had not been adequately capturing the full liability
associated with units at distributors. The Company has largely
completed its internal work regarding its reserves analysis, and is
evaluating and resolving items in addition to rebate reserves that
could materially impact the restated periods or the Company's
results for the first quarter of 2006. Completion of the restatement
remains subject to further review by the Company's Audit
Committee and independent auditors.

Connetics will file its Form 10-Q for the first quarter of 2006 as
well as its restated financial statements in amendments to prior
reports with the Securities and Exchange Commission as soon as is
practicable. Given the restatement, investors should rely on
Connetics' forthcoming restated financial statements and other
financial information rather than previously filed financial
statements and other financial information.

In light of the matters discussed in this news release, the Company
is withdrawing its 2006 financial guidance previously provided on
May 3, 2006. The Company expects to provide an update on its
business and second quarter results in August.

65.     On this news, shares of Connetics plunged $3.93, or 33.6 percent, to close, on

30

July 10, 2006, at $7.76 per share, on unusually heavy trading volume.

**CONNETICS' VIOLATION OF GAAP RULES
IN ITS FINANCIAL STATEMENTS
<u>FILED WITH THE SEC</u>**

66.    These financial statements and the statements about the Company's financial results were false and misleading, as such financial information was not prepared in conformity with GAAP, nor was the financial information a fair presentation of the Company's operations due to the Company's improper accounting for and disclosure about its revenues, in violation of GAAP and SEC rules.

67.    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. Regulation S-X (17 C.F.R. § 210.4 01(a) (1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. § 210.10-01(a).

68.    Given these accounting irregularities, the Company announced financial results that were in violation of GAAP and the following principles:

(a)    The principle that "interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements" was violated (APB No. 28, ¶10);

(b)    The principle that "financial reporting should provide information that is useful to present to potential investors and creditors and other users in making rational investment, credit,

31

and similar decisions" was violated (FASB Statement of Concepts No. 1, ¶34);

      (c)     The principle that "financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events, and circumstances that change resources and claims to those resources" was violated (FASB Statement of Concepts No. 1, ¶40);

      (d)     The principle that "financial reporting should provide information about an enterprise's financial performance during a period" was violated (FASB Statement of Concepts No. 1, ¶42);

      (e)     The principle that "completeness, meaning that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions" was violated (FASB Statement of Concepts No. 2, ¶79);

      (f)     The principle that "financial reporting should be reliable in that it represents what it purports to represent" was violated (FASB Statement of Concepts No. 2, ¶¶ 58-59); and

      (g)     The principle that "conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered" was violated.  (FASB Statement of Concepts No. 2, ¶95).

      69.     The adverse information concealed by defendants during the Class Period and detailed above was in violation of Item 303 of Regulation S-K under the federal securities law (17 C.F.R. §229.303).

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

      70.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased the common stock of Connetics between June 28, 2004 and July 9, 2006, inclusive (the "Class

Period") and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

71.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Connetics' common stock was actively traded on NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Connetics or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

72.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

73.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

74.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

    a.      whether the federal securities laws were violated by defendants' acts as
            alleged herein;

    b.      whether statements made by defendants to the investing public during the

Class Period misrepresented material facts about the business, operations and management of Connetics; and

c.     to what extent the members of the Class have sustained damages and the proper measure of damages.

75.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

76.     The market for Connetics' common stock was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, Connetics' common stock traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Connetics common stock relying upon the integrity of the market price of Connetics' common stock and market information relating to Connetics, and have been damaged thereby.

77.     During the Class Period, defendants materially misled the investing public, thereby inflating the price of Connetics' common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

34

78.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Connetics' business, prospects and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Connetics and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION

79.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

80.     During the Class Period, Plaintiff and the Class purchased common stock of Connetics at artificially inflated prices and were damaged thereby.  The price of Connetics common stock declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

81.     As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or

disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Connetics, their control over, and/or receipt and/or modification of Connetics' allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Connetics, participated in the fraudulent scheme alleged herein.

82.     During the Class Period, and with the Company's stock trading at artificially inflated prices, the Individual Defendants sold 165,779 shares of the Company's stock for gross proceeds of $3,699,512.00, as evidenced by the following chart:

| NAME | DATE | SHARES SOLD | PRICE | GROSS PROCEEDS |
|---|---|---|---|---|
| Thomas G. Wiggans | 8/9/2004 | 12,000 | $25.0464 | $300,556.80 |
| | 8/9/2004 | 500 | $25.0464 | $12,523.20 |
| | 11/8/2004 | 500 | $27.213 | $13,605.00 |
| | 11/8/2004 | 12,000 | $27.213 | $326,556.00 |
| | 2/7/2005 | 12,000 | $23.4596 | $281,515.20 |
| | 2/7/2005 | 500 | $23.4596 | $11,729.80 |
| | 3/14/2005 | 30,000 | $27.71 | $831,300.00 |
| | 7/1/2005 | 8,000 | $17.4308 | $139,446.40 |
| | 7/1/2005 | 12,000 | $17.4308 | $209,169.60 |
| | 8/1/2005 | 8,000 | $18.5298 | $148,238.40 |
| | 8/1/2005 | 12,000 | $18.5298 | $222,357.60 |
| | 9/1/2005 | 12,000 | $19.0772 | $228,926.40 |
| | 9/1/2005 | 8,000 | $19.0772 | $152,617.60 |
| | 11/15/2005 | 2,000 | $13.20 | $26,400.00 |
| | 11/15/2005 | 2,000 | $13.20 | $26,400.00 |
| | 12/15/2005 | 2,500 | $14.8562 | $37,140.50 |
| | 12/15/2005 | 1,500 | $14.8562 | $22,284.30 |
| | 1/13/2006 | 2,000 | $14.5443 | $29,088.60 |
| | 1/13/2006 | 2,000 | $14.5443 | $29,088.60 |
| | 3/1/2006 | 4,000 | $16.0615 | $64,246.00 |
| | | **Total: 143,500** | | **Total: $3,113,190.00** |

| | 8/9/2004 | 10,000 | $25.0455 | $250,455.00 |
|---|---|---|---|---|
| C. Gregory Vontz | 11/8/2004 | 10,000 | $27.2055 | $272,055.00 |
| | 4/25/2005 | 2,279 | $28.00 | $63,812.00 |
| | | **Total: 22,279** | | **Total: $586,322.00** |
| | | **TOTAL: 165,779** | | **TOTAL: $3,699,512.00** |

**Applicability of Presumption of Reliance:**
**Fraud On The Market Doctrine**

83.    At all relevant times, the market for Connetics common stock was an efficient market for the following reasons, among others:

a.    Connetics stock met the requirements for listing, and was listed and actively traded on NASDAQ, a highly efficient and automated market;

b.    As a regulated issuer, Connetics filed periodic public reports with the SEC and NASDAQ;

c.    Connetics regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d.    Connetics was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

84.    As a result of the foregoing, the market for Connetics common stock promptly

digested current information regarding Connetics from all publicly-available sources and reflected such information in Connetics' stock price. Under these circumstances, all purchasers of Connetics common stock during the Class Period suffered similar injury through their purchase of Connetics common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

85.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Connetics who knew that those statements were false when made.

## FIRST CLAIM
### Violation of Section 10(b) of
### The Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

86.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

87.     During the Class Period, defendants carried out a plan, scheme and course of

conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Connetics common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

88.     Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Connetics' common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.   All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

89.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Connetics as specified herein.

90.     These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Connetics' value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Connetics and its business operations

and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Connetics common stock during the Class Period.

91.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

92.     The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Connetics' operating condition and future business prospects from the investing public and supporting the artificially inflated price of its common stock.  As demonstrated by defendants' overstatements and misstatements of the Company's

40

business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

93.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Connetics common stock was artificially inflated during the Class Period.  In ignorance of the fact that market prices of Connetics' common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the common stock trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by defendants, but not disclosed in public statements by defendants during the Class Period, Plaintiff and the other members of the Class acquired Connetics common stock during the Class Period at artificially high prices and were damaged thereby.

94.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Connetics was experiencing, which were not disclosed by defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Connetics common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

95.     By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

96.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and

the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

## SECOND CLAIM
### Violation of Section 20(a) of
### The Exchange Act Against the Individual Defendants

97.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

98.     The Individual Defendants acted as controlling persons of Connetics within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

99.     In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

100.     As set forth above, Connetics and the Individual Defendants each violated Section

10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

a. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

b. Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d. Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: November 2, 2006      **BRODSKY & SMITH, LLC**

By:/s/*Evan J. Smith* (ES3254)
Evan J. Smith, Esquire
240 Mineola Boulevard
Mineola, NY 11501
(516) 741-4977
(516) 741-0626 (fax)

Attorneys for Plaintiff