1

2

3

4

5                        IN THE UNITED STATES DISTRICT COURT

6                    FOR THE NORTHERN DISTRICT OF CALIFORNIA

7

8  In re CONNETICS CORPORATION                   No. C 07-02940 SI

9  SECURITIES LITIGATION                         **ORDER GRANTING IN PART AND
                                                 DENYING IN PART DEFENDANTS'**
10                                               **MOTIONS TO DISMISS AND DENYING
                                                 DEFENDANTS' MOTIONS TO STRIKE**
11  _____/

12

13        Defendants have filed motions to dismiss the Second Amended Consolidated Class Action

14  Complaint for Violations of the Federal Securities Laws, as well as motions to strike portions of that

15  complaint.  The motions are scheduled for hearing on August 15, 2008.  Pursuant to Civil Local Rule

16  7-1(b), the Court finds this matter appropriate for resolution without oral argument, and hereby

17  VACATES the hearing.  Having considered the arguments of the parties and the papers submitted, and

18  for good cause shown, the Court hereby GRANTS IN PART and DENIES IN PART defendants'

19  motions to dismiss and DENIES defendants' motions to strike.

20

21                                **BACKGROUND[1]**

22        This is a securities class action against Connetics Corporation and certain of its officers  under

23  Sections 10(b), 20(a), 20A and Rule 10b-5 of the Securities Exchange Act of 1934 (the "Exchange

24  Act").  The case is brought on behalf all purchasers of the publicly-traded securities of Connetics

25  between January 27, 2004, and July 9, 2006 ("the class period").

26        Connetics is a pharmaceutical company specializing in prescription dermatological products.

27  _____

28      [1] The following background facts are taken from the allegations of plaintiffs' Second Amended
    Complaint, which for purposes of this motion, must be taken as true.

Plaintiffs allege that during the class period, Connetics was developing a new acne medication called Velac Gel ("Velac") that would allow Connetics to participate in the lucrative market of prescription acne medications. In the period leading up to what defendants hoped would be the approval of Velac by the Food and Drug Administration ("FDA"), defendants provided investors with frequent updates about Velac's progress, its likely date of approval by the FDA, and projected revenues that would be realized once Velac hit the market. However, defendants failed to inform investors about the results of a pre-clinical test performed on transgenic mice; these results demonstrated that Velac caused "cancerous skin tumors" in 89 out of approximately 160 mice. Second Amended Complaint ("SAC") at ¶ 7. Defendants learned the results of this study in June 2004. On June 28, 2004, they convened a panel of experts to discuss the study; the panel concluded that they did not know of any drug that exhibited "a 'positive dermal' similar to Velac that had ever been approved by the FDA." *Id.* at ¶ 8. According to the complaint, defendants concealed the results of this study from investors and analysts for almost a full year, continuing to tout Velac's safety and continuing to suggest that they expected the FDA to approve the drug by a certain date.

On April 13, 2005, some defendants participated in a conference call with the FDA during which the FDA allegedly informed the company that the results of the transgenic mouse study was a "serious issue" for Velac. *Id.* at ¶ 108. A confidential witness has confirmed that after this conference call, "it did not look good for obtaining approval of Velac." *Id.* Two weeks later, after the close of the market on April 26, 2005, defendants revealed to the public the fact that the study had yielded "positive" results (meaning a finding of carcinogenicity) and that the FDA was "interpreting some of the results of the [study] differently than the Company did." *Id.* at ¶ 116. Following this disclosure, Connetics' stock dropped 19% on heavy trading volume. Then, on Friday, June 10, 2005, Connetics received a formal "non-approvable" letter from the FDA, stating that Velac was unsafe. After disclosing this information prior to the opening of the market on Monday, June 13, 2005, Connetics' stock dropped 27% on heavy trading volume. The complaint also alleges that shortly after the April 2005 conference call with the FDA, defendants Alexander Yaroshinsky (a Connetics researcher) and Victor Zak (alleged to be Yaroshinsky's friend and former neighbor) used this information to profit from insider trading. The SEC filed a complaint against these two defendants in June 2006.

United States District Court
For the Northern District of California

1    In addition to the misleading statements made to investors regarding Velac, plaintiffs also allege

2   that defendants engaged in "channel stuffing" by shipping unneeded products to their customers in order

3   to inflate sales and revenue in the short term.  This channel stuffing, which was caused in part by a push

4   by certain defendants to increase demand forecasts of Connetics' products, allegedly resulted in the

5   filing of false financial statements that overstated revenue and understated rebates.  Connetics

6   announced on May 3, 2006, that it would likely have to restate its financial statements; that same day,

7   though prior to the formal announcement, Connetics' stock dropped by 12% on heavy trading volume.

8   On July 10, 2006, Connetics announced that it would have to reduce inventory at its distributors by

9   shipping less product, after which its stock dropped 34% on heavy trading volume.  On July 25, 2006,

10  Connetics restated its fiscal year 2005 Form 10-K, admitting accounting errors related to product rebates

11  and chargebacks.

12    The lead plaintiff in this action is the Teachers' Retirement System of Oklahoma.  The individual

13  defendants are Thomas Wiggans, the CEO and a director throughout the class period, as well as

14  president from July 1994 to February 2005; Gregory Vontz, the COO who was promoted to president

15  in February 2005; John Higgins, the executive vice president throughout the class period; Lincoln

16  Krochmal, executive vice president of research and product development starting in October 2003; and

17  Yaroshinsky and Zak.

18    In its prior order of January 29, 2008, the Court struck many paragraphs of plaintiffs' complaint

19  for failure to conduct an independent, reasonable investigation.  Because many of plaintiffs' allegations

20  relied on the stricken paragraphs, the Court also granted defendants' motions to dismiss.  Following that

21  order, plaintiffs filed the Second Amended Complaint currently before the Court.  All defendants have

22  filed motions to dismiss the amended complaint, and have also filed motions to strike portions of the

23  complaint.

24

25                                    **LEGAL STANDARD**

26  **1.      Rule 12(b)(6)**

27    Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it

28  fails to state a claim upon which relief can be granted.  The question presented by a motion to dismiss

3

is not whether the plaintiff will prevail in the action, but whether the plaintiff is entitled to offer evidence in support of the claim. *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *overruled on other grounds by Davis v. Scherer*, 468 U.S. 183, 104 S. Ct. 3012 (1984).

In answering this question, the Court must assume that the plaintiff's allegations are true and must draw all reasonable inferences in the plaintiff's favor. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). Even if the face of the pleadings suggests that the chance of recovery is remote, the Court must allow the plaintiff to develop the case at this stage of the proceedings. *See United States v. City of Redwood City*, 640 F.2d 963, 966 (9th Cir. 1981).

If the Court dismisses the complaint, it must then decide whether to grant leave to amend. The Ninth Circuit has "repeatedly held that a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (citations and internal quotation marks omitted).

**2.    Section 10(b) and Rule 10b-5**

Section 10(b) of the Securities Exchange Act provides, in part, that it is unlawful "to use or employ in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). Rule 10b-5 makes it unlawful for any person to use interstate commerce:

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

In order to state a claim under section 10(b) and Rule 10b-5, the plaintiff must allege (1) a misrepresentation or omission (2) of material fact (3) made with scienter (4) on which the plaintiff

justifiably relied (5) that proximately caused the alleged loss. *See Binder v. Gillespie*, 184 F.3d 1059, 1063 (9th Cir. 1999). Generally, plaintiffs in federal court are required to give a short, plain statement of the claim sufficient to put the defendants on notice. The Federal Rules of Civil Procedure also require that "the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b).

**3.      Private Securities Litigation Reform Act**

The Private Securities Litigation Reform Act of 1995 (the "PSLRA") was enacted as an amendment to the Exchange Act. *See In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 973 n.2 (9th Cir. 1999). Under the PSLRA:

> In any private action arising under his chapter under which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind. 15 U.S.C. § 78u-4(b)(2).

The required state of mind is "at a minimum, deliberate recklessness." *In re Silicon Graphics*, 183 F.3 at 983. Scienter may be pled and proven by reference to circumstantial evidence. *See In re Peoplesoft Sec. Litig.*, No. C 99-0472, slip op. at 5 (May 26, 2000). However, when pleading on information and belief, a plaintiff must plead with "particularity" by "provid[ing] all facts forming the basis for [plaintiff's] belief in great detail." *In re Silicon Graphics*, 183 F.3d at 983; *see also* 15 U.S.C. § 78u-4(b)(1). Therefore, the PSLRA has strengthened the pleading requirements of Federal Rule of Civil Procedure 9(b).

**4.      Rule 9(b)**

Rule 9(b) of the Federal Rules of Civil Procedure requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Federal securities fraud claims, like common law fraud claims, are subject to the special pleading requirements of Rule 9(b). *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir. 1985).

Rule 9(b) requires particularity in pleading the circumstances constituting fraud. The Ninth

Circuit has interpreted this requirement to mean that allegations of fraud must be specific enough to give defendants notice of "the particular misconduct which is alleged to constitute the fraud." *See id.* In the securities context, a plaintiff must state the "time, place, and content" of the alleged misrepresentations, and "an explanation as to why the statement or omission complained of was false or misleading." *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1547-48 (9th Cir. 1994) (en banc) (remanded to *In re GlenFed, Inc. Sec. Litig.*, 60 F.3d 591 (9th Cir. 1995)).

**5.      Request for judicial notice**

Generally, when considering a motion to dismiss, a district court must consider only the facts stated in the plaintiffs' complaint, or in documents attached to the complaint as exhibits or incorporated into the complaint by reference. Under certain circumstances, the court may also consider matters that are appropriate subjects of judicial notice under Fed. R. Evid. 201. *Kramer v. Time Warner*, 937 F.2d 767, 773 (2d Cir. 1991). While the general rule is that "[m]atters outside the pleadings are not to be considered by a court in ruling on a 12(b)(6) motion to dismiss," *Weiner v. Klais and Co., Inc.*, 108 F.3d 86, 88 (6th Cir. 1997), in a securities action a court may also consider certain documents that the defendant has attached to its motion to dismiss either as exhibits or accompanied by a request for judicial notice, *Glenbrook Capital Ltd. P'ship v. Kuo*, 525 F. Supp. 2d 1130, 1137 (N.D. Cal. 2007).

**DISCUSSION**

**I.      Motion to strike**

Before reaching defendants' motions to dismiss, the Court must address the motions to strike portions of the Second Amended Complaint filed by all defendants. Defendants contend that paragraphs 16, 40-41, 44-48, 52-55, 92, 94, 107-108, 133-144, 146, 310-311, 368-369, and 389-391 of the complaint were taken from a complaint filed by the SEC against defendants Yaroshinsky and Zak. Defendants argue that the paragraphs in question should be stricken because lifting allegations from an SEC complaint does not constitute the reasonable investigation required by Federal Rule of Civil Procedure 11(b). Defendants base their argument on this Court's previous order granting a motion to strike filed by defendants Yaroshinsky and Zak. *See* January 29, 2008 Order at 8-11; *In re Connetics*

*Corp. Secs. Litig.*, 542 F. Supp. 2d 996, 1004-06 (N.D. Cal. 2008).  There, the Court held that plaintiffs could not rely "*entirely* on another complaint as the *sole* basis for [their] allegations," as plaintiffs had acknowledged doing.  January 29, 2008 Order at 9.  The Court granted plaintiffs leave to amend in part to permit them to conduct a reasonable factual investigation that would comply with the requirements of Rule 11(b).  Having examined plaintiffs' Second Amended Complaint, the Court is now satisfied that plaintiffs have done so.  Although plaintiffs continue to rely in part on the SEC complaint, plaintiffs have explained what other sources they rely on to formulate their factual allegations and have explained how these other sources corroborate some, though not all, of the allegations from the SEC complaint. *See*, *e.g.*, SAC at ¶ 43(f) (alleging that Confidential Witness 6 was present at the April 13, 2005 FDA meeting and has provided information corroborating the FDA's views of Velac, as alleged in the SEC complaint).  Plaintiffs have indicated that the allegations in their complaint "are based upon information and belief," SAC at ¶ 42, such that additional evidentiary support may be forthcoming after further investigation and discovery, *see* Fed. R. Civ. P. 11(b)(3).  Plaintiffs also have attempted to talk with other witnesses who may possess information presented in the SEC complaint but who have refused to talk with plaintiffs, and plaintiffs have explained that as a result, certain information found only in the SEC complaint may be too difficult or impossible to acquire absent formal discovery.  For these reasons, the Court finds that plaintiffs have conducted "an inquiry reasonable under the circumstances," Fed. R. Civ. P. 11(b)(3), and are no longer relying solely on the investigations of attorneys at the SEC, as it appeared was the case when the Court considered defendants' prior motion to strike.  The motions to strike are DENIED.

## II.    Motion to dismiss Section 10(b) claims

### A.    False or misleading statements related to the drug Velac

Plaintiffs' second amended complaint contains allegations of numerous fraudulent statements pertaining to Velac made by defendants in press releases, conference calls, SEC filings, and more.[2] Because the volume of allegedly actionable statements is so large, the Court will not examine each

---

[2] In considering the motions to dismiss, the Court takes judicial notice of the documents submitted by defendants, but does not take judicial notice of disputed facts therein.

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

statement individually but will instead group them into three areas for purposes of defendants' motion to dismiss: (1) forward-looking statements about the likely date of FDA approval of Velac; (2) statements about the safety of Velac; and (3) statements disclosing the transgenic mouse study and conversation with the FDA regarding this study. *See In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 928 (9th Cir. 1996) (grouping challenged statements).

(1)     **Statements about FDA approval made between June 2004 and April 13, 2005**

The Court previously held that statements about Velac's future success and the FDA's likely approval of Velac ware protected by the safe harbor provision of the PSLRA because they were forward-looking statements and plaintiffs had failed to plead that they were made with actual knowledge of falsity. Plaintiffs now allege instead that defendants made false and misleading statements not about the *likelihood* that Velac would be approved by the FDA but about the *timing* of such approval. That is, defendants falsely stated that Velac would likely be approved by June 25, 2005 – the date that had been set by the FDA for ruling on the Velac application – even though they knew about the troubling results of the transgenic mouse study. These results, plaintiffs allege, meant that defendants knew that additional testing of Velac would be required, testing that would push out any possible approval date by at least months after June 2005. Typical of these statements is the announcement made during the January 25, 2005 conference call that defendants expected Velac "to be launched midyear . . . In 2006, we forecast enjoying a full year of Velac sales." SAC at ¶ 242; *see also id.* at ¶¶ 244, 252.

Forward-looking statements, which include "a statement of the plans and objectives of management," a statement "of future economic performance," and a statement "containing a projection of revenues," 15 U.S.C. § 78u-5(i)(1), enjoy special protection under the PSLRA. "A forward-looking statement qualifies for the PSLRA 'safe harbor' and is not actionable if either of the following two conditions is true: (A) the statement is accompanied by 'meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement'; or (B) plaintiffs fail to establish that the statement was 'made with actual knowledge . . . that the statement was false or misleading.'" *In re iPass, Inc. Sec. Litig.*, 2006 WL 496046 *5 (N.D. Cal.

1   Feb. 28, 2006).

2          The new allegations with regard to statements made prior to April 2005 about the timing of the

3   FDA's approval of Velac do not change the Court's prior view that these statements fall under the safe

4   harbor provision because plaintiffs have failed to adequately allege that defendants had actual

5   knowledge of the falsity of these statements at the time their predictions were made.  All that plaintiffs

6   allege is that two confidential witnesses have stated that results similar to the transgenic mouse study

7   results for Velac would require additional carcinogenic testing prior to FDA approval.  SAC at ¶¶ 96-98.

8   Plaintiffs make no allegation that these confidential witnesses informed defendants of this need for

9   additional testing, that anyone else informed defendants of this need, or that defendants themselves

10  knew that additional testing would be necessary.  All that plaintiffs allege is that these two witnesses

11  assert the need for additional testing in such situations.  That allegation is not sufficient to demonstrate

12  that statements predicting an optimistic FDA approval date were made with actual knowledge that it

13  would be impossible for the FDA to approve Velac prior to June 25, 2005.

14         As a result, these forward-looking statements about the timing of FDA approval fall under the

15  second prong of the safe harbor provision of the PSLRA.  15 U.S.C. § 78u-5(c)(1)(B)(i).  Plaintiffs

16  argue that these statements, despite referring to future approval by the FDA, are not forward-looking

17  because they failed to disclose historical facts about the transgenic mouse study results.  Even assuming

18  this is true, such that the safe harbor provision would not apply, the statements in question still are not

19  actionable because, without knowledge by defendants of the need for additional testing, the complaint

20  does not adequately allege that the statements were false or misleading when made.  17 C.F.R. §

21  240.10b-5.  Thus, the Court GRANTS defendants' motion to dismiss plaintiffs' complaint with regard

22  to this category of statements, and need not reach defendants' argument that the first prong of the safe

23  harbor provision applies.

24

25         **(2)    Statements about Velac's safety made after June 2004**

26         The second group of allegedly false or misleading statements consists of those regarding the

27  safety of Velac made following June 2004, when defendants were allegedly aware of the results of the

28  transgenic mouse study.  Plaintiffs argue that when discussing Velac's safety, defendants had a duty to

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    disclose additional information about the transgenic results.  Defendants argue that they had no duty to

2    disclose the results of the transgenic mouse study.

3        "[I]n order for there to be liability under 10b-5 for omissions or nondisclosure, . . . a duty to

4    speak must exist."  *In re CV Therapeutics, Inc. Sec. Litig.*, 2004 WL 1753251 *8 (N.D. Cal. Aug. 5,

5    2004) (internal quotation marks omitted) (quoting *In re MedImmune, Inc. Sec. Litig.*, 873 F. Supp. 2d

6    953, 966 (D. Md. 1995)); *see also SEC v. Fehn*, 97 F.3d 1276, 1289 (9th Cir. 1996).  A legal duty exists

7    where a defendant must "'state a material fact necessary in order to make the statements made . . . not

8    misleading.'"  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S.Ct. 2499, 2507 (2007) (quoting 17

9    C.F.R. § 240.10b-5).  This duty "is a general one, and arises whenever a disclosed statement would be

10   'misleading' in the absence of the 'disclos[ure] of [additional] material facts' needed to make it not

11   misleading."  *Fehn*, 97 F.3d at 1290 n.12 (alterations in original).

12       Defendants' statement regarding safety was made in a Form 10-K filed on March 16, 2005.

13   There, defendants asserted that the data from prior clinical trials "demonstrated that Velac was safe and

14   well tolerated, with the most commonly observed adverse effects being application site reactions such

15   as burning, dryness, redness and peeling.  Following this positive clinical outcome, we submitted an

16   NDA with the FDA for Velac on August 2004."  SAC at ¶ 250.  Although defendants made this

17   statement at a time when they were allegedly aware of the results of the transgenic mouse study showing

18   that Velac may cause cancer, the statement made no mention of the mouse study or the results.  The

19   Court previously explained that this statement may have been misleading because it was made without

20   the disclosure of additional facts that raised serious questions about the safety of Velac, but the Court

21   granted defendants' motion to dismiss regarding Velac's safety because the Court had stricken

22   paragraphs of the original complaint regarding defendants' knowledge of the transgenic mouse study.

23   As discussed above, the Court's prior concerns regarding the stricken paragraphs have been alleviated,

24   plaintiffs have adequately alleged that defendants had knowledge of the transgenic mouse study, SAC

25   at ¶¶ 91-94, and the Court now finds that plaintiffs have adequately pled that statements regarding

26   Velac's safety were misleading.

27       In addition, the Court finds that a statement made during the January 25, 2005 conference call

28   was misleading.  On that call, defendant Gregory Vontz stated that "'we're very confident in the data

10

set that we've got. We believe it's one of the strongest data sets for an acne products [sic] submitted to the FDA.'" *Id.* at ¶ 243. Opinions such as these are actionable where there is no reasonable basis for the belief or where the "speaker is [] aware of [] undisclosed facts tending to seriously undermine the accuracy of the statement." *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1113 (9th Cir. 1989). At the time of this statement, plaintiffs have alleged that defendants had actual knowledge of the results of the transgenic mouse study, and defendants also knew, as they themselves aver, that very few other drugs with similar test results had been approved by the FDA. For this reason, the Court finds that plaintiffs have put forth sufficient allegations to show there was no reasonable basis for the belief that Velac was one of the strongest data sets for an acne product submitted to the FDA and that Vontz had actual knowledge of undisclosed facts tending to seriously undermine the accuracy of the statement. The Court DENIES defendants' motion to dismiss as to these statements.

### (3) Statements disclosing the test results and the FDA's concerns

The third group of allegedly false or misleading statements consists of those made after April 13, 2005, when defendants learned from the FDA's Executive Carcinogenicity Assessment Committee ("ECAC") that the FDA might have serious concerns about Velac as a carcinogen. The alleged false or misleading statements include those made at the April 14, 2005, Annual Analyst and Investor Day, at which defendants (1) increased revenue projections for 2005 even though this projection assumed that Velac would be approved in June 2005 and (2) gave a favorable presentation about Velac without disclosing the FDA's concerns. SAC at ¶¶ 253-59. The statements in this category also include those made in an April 26, 2005 press release and investor conference call disclosing the conversation with the ECAC, in which defendants continued to assert that Velac would earn revenue in 2005, failed to inform investors that the FDA had serious concerns about Velac, and failed to inform investors that defendants' own panel of experts had warned that they knew of no drug exhibiting similar transgenic study results that had been approved by the FDA. *Id.* at ¶¶ 260-65.

Defendants argue that plaintiffs have failed to allege that any defendant was present for the ECAC conversation or was made aware of ECAC's concern that the transgenic mouse study results raised a "serious issue." *Id.* at ¶¶ 108. Plaintiffs allege, however, that defendants were informed of the

comments and conclusions of the ECAC, and that defendants approved a ban on trading Connetics securities by people who had attended the ECAC conference call or were involved in preparing regulatory submissions for Velac. *Id.* at ¶ 110. These allegations indicate the seriousness of the FDA's preliminary views of Velac, and it would strain credibility for the Court to assume that executive officers were not informed of such serious comments by the ECAC. Defendants also argue that they cannot be liable for these statements because they were made in the context of voluntary disclosures to which the market did react negatively. The Court agrees with plaintiffs, however, that defendants could still be liable for making misleading statements regardless of the special circumstances on which defendants rely.

The Court previously explained that defendants may have made misleading statements by failing to disclose the extent of the conversation with the ECAC, but the Court ultimately granted defendants' motion to dismiss with regard to statements made after April 13, 2005, because plaintiffs' allegations relied on paragraphs that had been stricken from the complaint. Now that plaintiffs may rely on these paragraphs in their amended complaint, the Court finds that plaintiffs have adequately alleged that defendants made misleading statements when they informed the public about the conversation with ECAC without acknowledging the seriousness of ECAC's concerns or the full extent of the concerns expressed by defendants' own panel of experts. *See In re CV Therapeutics*, 2004 WL 1753251 at * 6 ("[T]he concerns raised by the FDA . . . were much more significant than a bump on the road and shed serious doubt on the sufficiency of the trials. Accordingly, Defendants were obligated to disclose the FDA's concerns to render their statements not misleading." (quoting *In re Amylin Pharms., Inc. Sec. Litig.*, 2003 WL 21500525 *6 (S.D. Cal. May 1, 2003)) (internal quotation marks omitted)). Plaintiffs also have adequately alleged that defendants made misleading statements when they stated that Velac would likely earn revenue in 2005 and made statements that relied on this assumption.

As to plaintiffs' allegation that defendants misinformed people attending the Annual Analyst and Investor Day with a favorable presentation about Velac, the Court notes that plaintiffs have not pled precisely what defendants stated about Velac, but instead rely on reports by third parties stating that defendants had provided positive information about Velac's test results and Velac's potential without disclosing the FDA's concerns about the transgenic mouse study. *See* SAC at ¶¶ 254-58. It is clear to

United States District Court
For the Northern District of California

1    the Court that plaintiffs are not alleging that defendants adopted the statements of these third parties,

2    *see In re Stac Elec. Sec. Litig.*, 89 F.3d 1399, 1410 (9th Cir. 1996), but rather attempting to demonstrate

3    what statements defendants made by showing how the statements were reported, *see Nursing Home*

4    *Pension Fund v. Oracle Corp.*, 380 F.3d 1226, 1234-35 (9th Cir. 2004). As such, the Court finds that

5    plaintiffs have adequately pled that defendants made misleading statements regarding Velac's likely

6    success in spite of their knowledge that the FDA had serious concerns about whether Velac could be

7    approved.

8            Finally, plaintiffs also allege that defendants told an analyst that only one mouse in the study had

9    developed skin tumors and had misleadingly compared the FDA's approval of benzoyl peroxide with

10   Velac. The Court agrees with plaintiffs that they have adequately alleged that defendants made a false

11   statement that only one mouse developed skin tumors in the Velac transgenic study. However, the Court

12   also finds that plaintiffs have failed to adequately allege that defendants knew that benzoyl peroxide

13   could not be compared to Velac or that defendants did not genuinely believe that benzoyl peroxide was

14   relevant to the question whether the FDA could still approve Velac despite the results of the transgenic

15   mouse test. Accordingly, the Court DENIES defendants' motion to dismiss as to all statements in this

16   category other than defendants' statements with regard to benzoyl peroxide.

17

18           **B.       Financial statements and channel stuffing**

19           The amended complaint also alleges a violation of Section 10(b) based on the filing of false

20   financial statements. The complaint alleges that defendants pushed excess product on their distribution

21   channels, resulting in inventories that were significantly higher than demand ("channel stuffing"). As

22   a result, plaintiffs allege that defendants understated the amount of rebates, chargebacks, and returns and

23   thus overstated Connetics' earnings. The Court previously granted defendants' motion to dismiss as to

24   these allegations because the issuance of restatements and acknowledgments of GAAP violations are

25   not enough to show scienter. In addition, the Court held that plaintiffs had not adequately alleged

26   channel stuffing because they had not alleged any specific details regarding the alleged channel-stuffing

27   practices.

28           "'[T]he mere publication of inaccurate accounting figures, or a failure to follow GAAP, without

13

1    more, does not establish scienter.'" *DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385,

2    390 (9th Cir. 2002) (quoting *In re Software Toolworks Inc.*, 50 F.3d 615, 627 (9th Cir. 1994)).  "Rather,

3    to plead fraudulent intent based on GAAP violations, plaintiffs must allege facts showing that: (1)

4    specific accounting decisions were improper; and (2) the defendants knew specific facts at the time that

5    rendered their accounting determinations fraudulent." *Morgan v. AXT, Inc.*, 2005 WL 2347125 * 14

6    (N.D. Cal. Sept. 23, 2005) (citing *DSAM Global Value Fund*, 288 F.3d at 390-391).  The practice of

7    "channel stuffing" is "'the oversupply of distributors in one quarter to artificially inflate sales, which

8    will then drop in the next quarter as the distributors no longer make orders, while they deplete their

9    excess supply.'" *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1076 (N.D. Cal.

10   2001) (quoting *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1298 (9th Cir.1998)).  Recent authority

11   suggests that for an allegation of channel stuffing to be pled with sufficient particularity, it must "allege

12   'specific transactions, specific shipments, specific customers, specific times, or specific dollar

13   amounts.'" *In re ICN Pharms., Inc. Sec. Litig.*, 299 F. Supp. 2d 1055, 1062 (C.D. Cal. 2004) (quoting

14   *In re Ashworth, Inc. Sec. Litig.*, 2000 WL 33176041 *6 (S.D. Cal. July 18, 2000)); *see also Greebel v.*

15   *FTP Software, Inc.,* 194 F.3d 185, 204 (1st Cir. 1999) ("The allegations in the complaint do not include

16   such basic details as the approximate amount by which revenues and earnings were overstated; the

17   products involved in the contingent transactions; the dates of any of the transactions; or the identities

18   of any of the customers or FTP employees involved in the transactions.  We do not say that each of these

19   particulars must appear in a complaint, but their complete absence in this case is indicative of the

20   excessive generality of these allegations." (internal citations omitted)).

21        Here, there is no dispute between the parties that defendants' financial statements were misstated

22   with regard to reserves.  Therefore, only scienter, i.e. whether defendants acted with, "at a minimum,

23   deliberate recklessness," *In re Silicon Graphics*, 183 F.3d at 983, is at issue with regard to the false

24   financial statements.  The Court now finds that although the complaint continues to lack specific detail

25   with regard to the alleged practice of channel stuffing, such as allegations about specific shipments,

26   customers, times, or dollar amounts, *see In re ICN Pharm.*, 299 F. Supp. 2d at 1062; *In re Ashworth*,

27   2000 WL 33176041 at *6; *Greebel*, 194 F.3d at 204, plaintiffs have adequately alleged scienter with

28   regard to the false financial statements based on the allegations of the many confidential witnesses who

have spoken to defendants' knowledge that their estimates of rebates and chargebacks were artificially low. Plaintiffs have alleged that, for instance, that defendants Wiggans and Vontz "were repeatedly told during the Class Period that the amounts of product being shipped greatly exceeded the known data about the number of prescriptions written," SAC at ¶ 166, and that Wiggans, Higgins, and Vontz "were each aware that inventory levels at distributors were excessive throughout the Class Period," *id.* at ¶ 172. Plaintiffs allege that despite this knowledge of excessive inventory, defendants "deliberately manipulated Connetics' forecasting process" – the process by which the company would estimate demand for their products and determine the quantity of products that should be shipped – in order "to justify selling more product into the distribution channel than was needed to meet demand." *Id.* at ¶ 169. At monthly forecast meetings, defendants were kept apprised of demand for their products but "would regularly direct employees to increase forecasts so that the Company could internally justify selling more products to distributors than a good-faith estimate of the future retail demand would permit." *Id.* at ¶ 170. Plaintiffs allege that defendants were more concerned with ensuring that forecasts matched Wall Street's expectations than with ensuring that forecasts accurately reflected the amount of product needed to satisfy demand. *Id.* at ¶¶ 170, 172. Thus, despite the lack of specific allegations regarding the nuts and bolts of defendants' alleged channel stuffing, plaintiffs have adequately alleged that defendants were, at the very least, deliberately reckless with regard to reporting rebates and chargebacks because defendants "knew specific facts at the time that rendered their accounting determinations fraudulent," *Morgan*, 2005 WL 2347125 at *14, i.e. knew the distribution channels had excessive inventory and knew that the company had been artificially increasing demand forecasts in order to satisfy the expectations of Wall Street rather than meet the realistic demand or attempt to sell more aggressively.

Defendants also argue that plaintiffs have not demonstrated loss causation that resulted from defendants' disclosure of the need to restate historical financial statements. Defendants argue that stock prices actually increased after the May 3, 2006 disclosure, and that the July 10, 2006 disclosure cannot be the basis of plaintiffs' loss causation allegation because it falls outside the class period and because defendants did not reveal any new information on that day concerning Connetics' 2004 or 2005 reserves or financial statements. In response, plaintiffs argue and allege that the May 3, 2006 disclosure must

15

have been leaked to the market in time to affect trading on May 3rd itself, when stock prices declined after heavy trading. While plaintiffs have not pointed to any specific evidence tending to demonstrate that the May 3rd disclosure may have been leaked, plaintiffs may be able to put forth such allegations following discovery, and it is plausible, based on the drop in stock prices on May 3rd, that defendants' disclosure of the need to restate its financial statements was leaked to the public prior to the close of the markets on that day. *In re Gilead Scis. Sec. Litig.*, No. 06-16185, slip op. at 10336 (9th Cir. Aug. 11, 2008) ("So long as the complaint alleges facts that, if taken as true, plausibly establish loss causation, a Rule 12(b)(6) dismissal is inappropriate."). In addition, the Court finds that plaintiffs have adequately alleged loss causation with regard to the July 10, 2006 disclosure. There, defendants stated that they had decided to reduce wholesaler inventory even further by shipping below estimated demand for the remainder of 2006, thus indicating to the market the extent of prior revelations about inventory levels. SAC at ¶¶ 182-84. The Court also agrees with plaintiffs that they may allege loss causation based on a disclosure that occurred the day after the end of the class period. *In re Dura Pharm., Inc., Sec. Litig.*, 452 F. Supp. 2d 1005, 1023 (S.D. Cal. 2006). Accordingly, the Court DENIES defendants' motion to dismiss with regard to defendants' financial statements.

### C.    Scienter

In addition to specifying what statements were misleading and why, 15 U.S.C. § 78u-4(b)(1), "the PSLRA requires that the Complaint 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind,' or scienter," *Nursing Home Pension Fund*, 380 F.3d at 1230 (quoting 15 U.S.C. § 78u-4(b)(2)). This inquiry "is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 127 S. Ct. at 2509. Here, the required state of mind is at least "deliberate recklessness," meaning recklessness that "reflects some degree of intentional or conscious misconduct." *Nursing Home Pension Fund*, 380 F.3d at 1230 (internal quotation marks omitted). As discussed above, plaintiffs have adequately plead scienter with regard to the filing of false financial statements. In addition, for the reasons discussed above, the Court also finds that all of the alleged facts strongly infer scienter with regard to defendants' false or misleading statements about Velac.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

**III.    Motion to dismiss Section 20(a) claims**

Defendants argue that plaintiffs' claim under Section 20(a) of the Exchange Act must be dismissed because plaintiffs have not pled a viable claim under Section 10(b) and also because plaintiffs have not pleaded facts showing that defendants Wiggans, Vontz, and Higgins were "control persons." Under Section 20(a) of the Exchange Act, "[e]very  person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a). "Section 20(a) provides joint and several liability for controlling persons who aid and abet violations of the 1934 Act absent a finding of good faith and lack of inducement." *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*, 320 F.3d 920, 945 (9th Cir. 2003). To state a claim under Section 20(a), "a plaintiff must prove: (1) a primary violation of federal securities law and (2) that the defendant exercised actual power or control over the primary violator." *Id.* (internal quotation marks omitted).

As to the threshold requirement of Section 20(a), plaintiffs have pled a claim under Section 10(b). The Court also finds that plaintiffs have sufficiently alleged, for purposes of a motion to dismiss, that defendants Wiggans, Higgins, and Vontz were control persons. *See* SAC at ¶¶ 376-81. The Court therefore DENIES defendants' motion to dismiss plaintiffs' Section 20(a) claims.

**IV.    Motion to dismiss Section 20A claims**

Defendants also contend that plaintiffs' claim under Section 20A must be dismissed for failure to plead an independent violation of the Exchange Act, because the claim lacks particularized facts showing that defendants Wiggans, Vontz, and Higgins sold Connetics stock on the basis of material nonpublic information, and because plaintiffs have not demonstrated that they traded contemporaneously with the alleged insiders.

Section 20A of the Exchange Act creates a private right of action against "any person" who violates the Exchange Act by purchasing or selling securities "while in possession of material, nonpublic information." 15 U.S.C. § 78t-1(a). The Act states that such person is liable to any investor who,

17

United States District Court
For the Northern District of California

1  "contemporaneously with the purchase or sale of securities" by the insider, purchased or sold securities

2  of the same class. *Id.*

3       As an initial matter, plaintiffs have pled a claim under Section 10(b) and thus have satisfied the

4  requirement that they show an independent violation of the Exchange Act. *Johnson v. Aljian*, 490 F.3d

5  778, 781 (9th Cir. 2007) (claims under § 20A require an independent violation of the Exchange Act).

6  The Court finds, however, that plaintiffs have failed to allege the dates when Wiggans and Vontz traded

7  on inside information, and have only alleged contemporaneous trading with regard to Higgins.

8  Although plaintiffs suggest that this one allegation of contemporaneous trading is sufficient, plaintiffs

9  have provided no support for their argument that contemporaneous trading with Higgins alone can

10  satisfy the requirement for contemporaneous trading with the other defendants. For these reasons, the

11  Court GRANTS defendants' motion to dismiss plaintiffs' claims under Section 20A against Wiggans,

12  Vontz, and Higgins. The Court will permit plaintiffs to amend their complaint with regard to these

13  claims.

14

15  **V.    Motion to dismiss claims against defendants Yaroshinsky and Zak**

16       The Second Amended Complaint also alleges claims against defendants Yaroshinsky and Zak

17  for violations of Section 10(b) and Section 20A. Defendants move to dismiss these claims, primarily

18  on the ground that plaintiffs did not trade contemporaneously with Yaroshinsky or Zak. The

19  contemporaneous trading requirement is a "judicially-created standing requirement, specifying that to

20  bring an insider trading claim, the plaintiff must have traded in a company's stock at about the same

21  time as the alleged insider." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1001 (9th Cir. 2002).

22  It applies to actions brought under Section 10 and Rule 10b-5, *see id.*, as well as to actions brought

23  under Section 20A, 15 U.S.C. § 78t-1(a). The Ninth Circuit has not decided the length of the

24  contemporaneous trading period, *Brody*, 280 F.3d at 1002, but many district courts have defined

25  contemporaneous trading as trading that occurs on the same day, *see*, *e.g.*, *In re MicroStrategy, Inc. Sec.*

26  *Litig.*, 115 F. Supp. 2d 620, 664 (E.D. Va. 2000); *In re AST Research Sec. Litig.*, 887 F. Supp. 231, 234

27  (C.D. Cal. 1995). A small number of other courts have alternatively indicated that the contemporaneous

28  trading period can be defined as the overall period during which defendants were selling stock on the

1     basis of insider information. *Middlesex Ret. Sys. v. Quest Software, Inc.*, 527 F. Supp. 2d 1164, 1196

2     (C.D. Cal. 2007).

3          Plaintiffs acknowledge that the lead plaintiff itself did not trade contemporaneously with

4     Yaroshinsky, because the lead plaintiff traded prior to Yaroshinsky's trades. *See In re Verifone Sec.*

5     *Litig.*, 784 F. Supp. 1471, 1489 (N.D. Cal. 1992) ("No liability can attach for trades made by plaintiffs

6     before the insider engages in trading activity."). Plaintiffs therefore put forth alternative theories

7     demonstrating how they meet the contemporaneous trading requirement for defendant Yaroshinsky.

8     First, plaintiffs argue that the lead plaintiff traded contemporaneously with defendant Higgins and

9     defendant Zak, and that this contemporaneous trading as to Higgins or Zak establishes the lead

10    plaintiff's standing as to other defendants. In making this argument, plaintiffs rely on this Court's prior

11    order, in which the Court held that for purposes of Article III standing, the lead plaintiff has standing

12    to bring multiple claims against defendants as long as the lead plaintiff has suffered injuries as the result

13    of some claims, even if the lead plaintiff has not suffered injuries arising from every claim asserted by

14    absent members of the class. In its prior order, however, the Court addressed constitutional standing,

15    not the contemporaneous trading requirement of Section 10(b) and Section 20A. *See Brody*, 280 F.3d

16    at 1001 ("These 'standing' limitations are not, of course of the constitutional variety, grounded in

17    Article III of the Constitution, but simply delineate the scope of the implied cause of action."). In

18    addition, the Court did not address the question whether the lead plaintiff would have standing with

19    regard to one defendant by virtue of its standing as to a separate defendant; rather, the Court considered

20    whether the lead plaintiff had standing to bring different claims against the same defendants. Plaintiffs

21    offer no additional support for their argument that the lead plaintiff's contemporaneous trading with one

22    individual defendant is sufficient to allege claims against another individual defendant, and the Court

23    therefore disagrees with plaintiffs that contemporaneous trading with Higgins or Zak, by itself, can

24    satisfy the contemporaneous trading requirement with regard to Yaroshinsky.

25         Second, plaintiffs suggest that even if the lead plaintiff did not trade contemporaneously with

26    Yaroshinsky, unnamed class members may have done so. In support of this argument, plaintiffs rely

27    on *In re Openwave Systems Securities Litigation*, 528 F. Supp. 2d 236 (S.D.N.Y. 2007), in which the

28    district court held that although the lead plaintiff may not have traded contemporaneously with the

19

United States District Court
For the Northern District of California

defendants, other members of the putative class had traded contemporaneously, and therefore satisfied this requirement of Section 20A, *id.* at 255-256; *see also Hevesi v. Citigroup, Inc.*, 366 F.3d 70, 82 (2d Cir. 2004). Defendants contend that the Ninth Circuit precludes such argument because it has held that the contemporaneous trading requirement was not met where two lead plaintiffs had not traded contemporaneously with the defendants. *See Brody*, 280 F.3d at 1001. It is true that in *Brody*, the Ninth Circuit did not look to the absent class members to determine whether they traded contemporaneously with the defendants, but it is unclear whether this issue was raised by the parties and it does not appear that the court expressly reached the question whether such absent class members could satisfy the trading requirement. Nevertheless, other courts in this district have reached this question, *see In re Verifone*, 784 F. Supp. at 1489-90 (rejecting contemporaneous trading by unnamed class members and noting that "[w]here a plaintiff lacks standing to bring a claim personally, that plaintiff cannot represent the class"); *In re Genentech, Inc., Sec. Litig.*, 1989 WL 201577, *6 (N.D. Cal. Dec. 11, 1989) (requiring creation of a subclass of plaintiffs who did make contemporaneous trades), and the Court believes the best way to proceed, for the purposes of both Rule 23 class action requirements and the contemporaneous trading requirements of Section 10(b) and Section 20A, is for plaintiffs to amend their complaint to allege a subclass of plaintiffs who traded contemporaneously with Yaroshinsky, *see Hevesi v. Citigroup, Inc.*, 366 F.3d at 83; *In re Genentech*, 1989 WL 201577 at *6. Leave to amend will be granted to permit plaintiffs to do so.

Third, plaintiffs argue that the lead plaintiff can satisfy the contemporaneous trading requirement through defendant Zak because Yaroshinsky is jointly and severally liable for Zak's trading under the tipper/tippee theory of liability. As an initial matter, the Court finds that plaintiffs have adequately alleged the tipper/tippee theory. However, the Court agrees with defendants that the lead plaintiff did not trade contemporaneously with defendant Zak's first trade. The complaint alleges that Zak traded on April 13, 2005, while the lead plaintiff traded on April 18, 2005, three trading days later. SAC at ¶¶ 134, 391. In many courts, these trades would not be contemporaneous because they did not occur on the same day. *See*, *e.g.*, *In re MicroStrategy*, 115 F. Supp. 2d at 664; *In re AST Research*, 887 F. Supp. at 234. Moreover, in this district it has been held that trades three days apart could not have been contemporaneous where trading volume was heavy on the day the defendant traded and there was a

significant difference in share price on the days in question. *Buban v. O'Brien*, 1994 WL 324093 *3 (N.D. Cal. June 22, 1994). That rule applies to the facts of this case, and plaintiffs do not contend otherwise.

However, plaintiffs also allege that Zak traded 68,000 shares of Connetics stock sometime between April 14, 2005 and June 10, 2005, SAC at ¶ 134, and thus could have traded contemporaneously with the lead plaintiff, who traded on April 18 and April 19. Defendants contend that this allegation is insufficient because plaintiffs do not name the particular dates of Zak's trades. The Court disagrees because plaintiffs have alleged a relatively small window in which Zak's trades occurred, have alleged with particularity the amount of shares sold, and are unable to pin down the precise dates of Zak's trades without the benefit of discovery. *See Neubronner*, 6 F.3d at 671. Accordingly, the Court finds that plaintiffs have alleged, with sufficient particularity, contemporaneous trading with regard to Zak and, by extension, Yaroshinsky, though it appears this applies only to plaintiffs' claim against Yaroshinsky for a violation of Section 20A.

The Court also must address three additional arguments raised by defendants. Defendants argue that plaintiffs have not adequately alleged that Yaroshinsky and Zak acted with scienter. The Court disagrees, and finds that plaintiffs have pled a strong inference of scienter because plaintiffs allege that Yaroshinsky participated in the ECAC conference call, immediately telephoned Zak after the conference call, took efforts to conceal his trading, traded in contravention of Connetics' trading ban, and traded after Connetics partially disclosed the fact of the ECAC conference call but did not fully disclose the extent of the FDA's concerns about Velac.

Defendants also argue that plaintiffs have not alleged an underlying violation of Section 10(b) by Yaroshinsky. The Court agrees with defendants that it is unclear what violation of Section 10(b) is alleged with respect to Yaroshinsky and Zak, and will permit plaintiffs to amend their complaint to make such a clarification. In the meantime, plaintiffs cannot assert a violation of Section 20A absent an underlying violation of Section 10(b).

Finally, defendants argue that plaintiffs do not seek appropriate relief under Section 20A. Plaintiffs may amend their complaint to clarify what relief they seek for any violations of Section 20A by Yaroshinsky and Zak.

1

2

3

**United States District Court**
For the Northern District of California

## CONCLUSION

For the foregoing reasons and for good cause shown, the Court hereby DENIES defendants' motion to strike portions of plaintiffs' Second Amended Complaint. The Court GRANTS without leave to amend defendants' motion to dismiss with regard to statements made about the timing of Velac's approval and about benzoyl peroxide, and DENIES defendants' motion to dismiss with regard to all other Velac-related statements. The Court DENIES defendants' motion to dismiss with regard to the filing of false financial statements. As to claims asserted under Section 20(a), the Court DENIES defendants' motion to dismiss. The Court GRANTS with leave to amend defendants' motion to dismiss the Section 20A claims alleged against defendants Wiggans, Higgins, and Vontz, and GRANTS IN PART with leave to amend defendants' motion to dismiss the Section 20A claims alleged against defendants Yaroshinsky and Zak.

**Any amended complaint must be filed on or before August 29, 2008.**

**IT IS SO ORDERED.**

Dated: August 14, 2008

SUSAN ILLSTON
United States District Judge